MEMORANDUM OF DECISION
This is an action for termination of parental rights brought by the Commissioner of the Department of Children and Families ("DCF"). The respondent, Nilda C., is the biological mother of Kachainy. The respondent, Freddie C., is the biological father of the child.
PROCEDURAL BACKGROUND
On January 10, 1992, DCF filed a neglect petition alleging that Kachainy was neglected in that the child was being denied proper care and attention, physically, educationally, emotionally or morally and that she was being permitted to live under conditions, circumstances or associations injurious to her well-being. Conn. Gen. Stat. § 46b-120
(8)(B)(C).
On January 14, 1992, the court granted DCF an order of temporary custody with regard to Kachainy.
On October 26, 1992, the court adjudicated Kachainy neglected and committed her to the care and custody of DCF. The mother was provided with court expectations at that time.
On March 11, 1998, Nilda was provided with specific steps that included keeping her whereabouts known to DCF, visiting Kachainy as often as DCF permitted, participating in counseling and attending all of Kachainy's medical appointments to participate in the training offered by Yale regarding Kachainy's medical treatment.
On July 16, 1998, and August 30, 1999, the court found that continuing efforts to reunite the family were no longer appropriate with regard to both parents. CT Page 8711
On August 30, 1999, DCF filed a petition for termination of parental rights of the biological parents. With regard to Nilda and Freddie, the petitioner alleged that Kachainy had been found in a prior proceeding to have been neglected and the mother and father had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the needs and age of the child, they could assume a responsible position in the life of the child. Conn.Gen. Stat. § 17a-112 (c)(3)(B). The petitioner also alleged that there is no ongoing parent/child relationship with the mother and father that ordinarily develops as a result of a parent having met on a continuing basis the physical, emotional, moral, or educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112(c)(3)(D). The petitioner also alleged that the child had been abandoned in the sense that the parents failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.Conn. Gen. Stat. § 17a-112(c)(3)(A).
The petitioner subsequently withdrew the abandonment grounds with regard to Nilda only. The parties stipulated that the relevant date for purposes of adjudication would be June 1, 2000.
Freddie C. was given proper statutory notice of the termination proceedings. A guardian ad litem was subsequently appointed to do a diligent search to locate him. Freddie failed to appear during the termination proceedings and was defaulted on the first day of trial.
For the reasons stated below, the court hereby terminates the parental rights of Nilda C. and Freddie C.
FACTUAL FINDINGS
The court makes the following findings by clear and convincing evidence.
Kachainy
Kachainy was born on February 13, 1990 with Acquired Immune Deficiency Syndrome ("AIDS").[2] Her mother and her younger sister also have AIDS. Kachainy was placed in DCF care at eighteen months because her mother was unable to provide appropriate medical care for her. At the time of placement, Kachainy was severely developmentally delayed, was grossly underweight and had a history of multiple hospitalizations.
Kachainy has a serious medical problem with regard to her respiratory CT Page 8712 system. Specifically, she has a chronic underlying condition, lymphocytic interstitial pneumonitis (LIP) which is due to her AIDS. This condition is life threatening. It contributes to obstructive pneumonia, which she has already had on six occasions. She has also had pneumocystis carinii pneumonia which is frequently fatal. While she survived this illness, it has left her respiratory status very fragile.
Over the years Kachainy's medications have changed. Her immune system has been erratic in continuing to respond to the medications, which is troubling to her providers because she has already been on many of the known medications for treating her condition. Currently, Kachainy is on five medications which she must receive several times during the day. As of December 29, 1999, her medication regimen consisted of ddc (1 pill three times a day), Viracept (two pills three times a day), Abacavir (one half pill two times a day), Bactrim (three teaspoons two times a day, three times a week), and Preone (six cc every other day). She also receives three other medications on an as needed basis. She is often in respiratory distress during the summer months and must have a nebulizer treatment administered, sometimes as often as four times per day.
Since 1992, Kachainy has been placed in the same foster home where she has received exceptional care. Her foster mother has kept Kachainy alive through strict compliance with medication, infusion therapy, regular attendance at clinic visits and her ability to recognize symptoms and contact medical providers when necessary. Because of the foster mother's impeccable care of Kachainy, she has not had to be hospitalized since 1993.
The nurse practitioner, who has treated Kachainy for the last eight years, testified that despite Kachainy's excellent medical care, her virus is "getting ahead of her" in that her blood work indicates a worsening of her immunodeficiency.
Dr. Julia Grenier found Kachainy to be a happy child with no significant emotional or behavioral problems. Kachainy refers to her foster mother as her "mom" and her biological mother as her "other mom". She views her foster mother as her psychological parent. Kachainy has a close and loving relationship with her sister Leslie. Leslie continues to reside with Nilda.
The Mother
In December of 1991, Nilda began receiving family support services through Yale University Child Study Center. The patient care manager who worked with Nilda from November of 1991 until January of 1992 found that Nilda was unable to recognize symptoms and failed to give medications CT Page 8713 regularly or contact the hospital when Kachainy was ill. In January of 1992, Kachainy was removed from Nilda's care because of mother's inability to care for her medically fragile daughter.
Despite DCF repeatedly stressing the importance of Nilda's involvement in Kachainy's medical care, by both attending medical appointments and regularly visiting with her, Nilda has been inconsistent over the last eight years.[3]
Nilda has always been aware that she was welcome to take part in Kachainy's medical appointments at Yale. However, she has missed the majority of her daughter's medical appointments over the last eight years. In 1998, she started receiving written notice in Spanish notifying her of any upcoming appointments for Kachainy. As of October 1999, she had missed twelve out of nineteen appointments. These appointments were critical not only for Nilda to spend time with her child but also to learn how to care for her. As of the time of trial, she had missed twenty-six out of thirty-five of Kachainy's appointments.
Additionally, Kachainy's medical providers felt that it was essential that Nilda visit regularly with Kachainy so that she would be able to utilize her training regarding the child's medical needs. Nilda has also been very inconsistent in her visitation. This is despite the fact that the visits were allowed to take place at Nilda's home. In May of 1995, DCF attempted to provide Nilda with two visits per week. She consistently failed to make the new Tuesday visit. DCF canceled the Tuesday visits in January of 1996 and reverted to one visit per week. Between June of 1996 and October of 1999, Nilda only visited with Kachainy fifty-two times out of a possible one hundred and ten visits. Between December 18, 1998 and February 19, 1999, she missed all six of the scheduled visits and between February 24, 1999 and June 29, 1999 she missed nine out of nineteen visits.
In June of 1998, Nilda was referred to the New Haven Family Alliance for intensive family preservation services. The case was closed a month later when Nilda missed three out of four appointments.
Kachainy's care givers at Yale have repeatedly stated that consistent care is essential for this child:
 "Meticulous administration of multiple medications, strict compliance with medical visits, consistent ability to provide home respiratory treatments when necessary and a thorough understanding of Kachainy's medical needs have been effective tools in combating this little girl's devastating illness. To deprive CT Page 8714 Kachainy of the above is to take a dangerous gamble that will cost Kachainy her life."
The nurse practitioner for Kachainy testified unequivocally and credibly that Nilda cannot adequately care for Kachainy. Despite Yale's efforts to have Nilda involved in the medical process for Kachainy, she has been unable to consistently attend the appointments to even start to learn about the care that her child needs.
Freddie
Freddie did not visit with Kachainy prior to being incarcerated in 1995. He then visited with her twice while incarcerated. After his release in 1996, he has not visited with her or had any contact with DCF about her welfare.
ADJUDICATION
TERMINATION ADJUDICATION
A termination petition that can sever family ties implicates serious constitutional concerns. The United States Supreme Court held in Santoskyvs. Kramer, 455 U.S. 745, 753 (1982) that: "the fundamental liberty interests of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents where they have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."
However, parents' constitutional rights do not exist in a vacuum without reference to the rights of others in the family. In particular, they do not override a child's right to be safe and to grow and to be nurtured in a supportive environment. As set forth in Conn. Gen. Stat.
§ 17a-101(a): "the public policy of this state is: to protect children whose health and welfare may be adversely affected through injury and neglect."
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF has "made reasonable efforts to locate the parent and reunify the child with the parent unless the court finds in the proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b
CT Page 8715 that such efforts are not appropriate." Id.
The court made the requisite finding on July 16, 1998 and August 30, 1999, that reunification efforts were no longer appropriate with regard to the biological parents.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book §33-3(a). The relevant date in this case is June 1, 2000.
FAILURE TO REHABILITATE
A statutory ground for termination arises when "the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn.Gen. Stat. § 17a-112(c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989).
No dispute exists that the court has previously found Kachainy to have been "neglected" or "uncared for" thus satisfying a statutory prerequisite. The rest of the statute requires the court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. §17a-112(c)(3)(B).
It is fundamental that a parent must demonstrate the ability to be consistent in his or her contact with the child in order to prove rehabilitation to the status of a responsible parent. As of the relevant adjudicatory date, Freddie had been virtually absent from his child's life except for two visits that took place while he was incarcerated. Since being released in 1996, he has made no effort to see his daughter. If a parent consistently fails to visit with his children, he is clearly not prepared to care for the children on a regular basis, with or without services. The court therefore finds by clear and convincing evidence that CT Page 8716 he has failed to rehabilitate within the meaning of the statute.
Nilda's visitation with her daughter has been inconsistent. Even more troubling is that beginning in 1998, she was informed by letter of every medical appointment that Kachainy was going to have at Yale. Both DCF and Yale informed Nilda of the importance of her attending and participating in those medical appointments in order that she could begin to learn to care for her child. As of the relevant adjudicatory date, Nilda had missed the majority of medical appointments that were scheduled since 1998. She has failed to demonstrate that she can visit with the child regularly, attend her medical appointments and learn how to care for this extremely medically fragile child. Given the needs and age of Kachainy, this mother has failed to demonstrate that she can assume a responsible position in the life of this child within a reasonable time. The court therefore finds by clear and convincing evidence that she has failed to rehabilitate within the meaning of the statute.
ABANDONMENT
The petitioner alleges that Kachainy has been abandoned by her father "in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."Conn. Gen. Stat. § 17a-112(c)(3)(A). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility' for the welfare of the child." In re Migdalia, 6 Conn. App. 194,208-209, cert. denied, 199 Conn. 309 (1986). "Conversely, where a parent fails to visit a child, fails to display any level of affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209.
There are five commonly understood general obligations of parenthood:
"(1) express love and affection for the child: (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." Id.
"Abandonment focuses on the parent's conduct." In re Juvenile Appeal,183 Conn. 11, 14 (1981). Freddie has failed to have any contact with his daughter since his release from incarceration in 1996. When a parent voluntarily chooses to not make himself available to his young child for a prolonged period of time, he has abandoned this child in a clear and compelling way. Freddie was aware of these termination proceedings and failed to take part in them. The court finds by clear and convincing CT Page 8717 evidence that Freddie C. has abandoned his child within the meaning of the statute.
NO ONGOING PARENT/CHILD RELATIONSHIP
The petitioner also alleges that Nilda C. and Freddie C. have no ongoing parent/child relationship with Kachainy that ordinarily develops as the result of the parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such a parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112(c)(3)(D). The Connecticut Supreme Court in In re Jessica M., 217 Conn. 459 (1991) found that termination on these grounds is inappropriate unless "the child has no present memories or feelings for the natural parent" or that if such child does have some memories, "no positive emotional aspects of their relationship survive."Id. at 468.
The Connecticut Supreme Court has held that termination is improper where the lack of an ongoing parent/child relationship is the "direct result" of a prior custody determination. In re Valerie D., 223 Conn. 492
(1992).
With regard to Nilda, the court finds that DCF has not proven by clear and convincing evidence that there is no ongoing parent/child relationship within the meaning of the statute. "In determining whether there is no ongoing parent-child relationship the court should consider the feelings of the child towards the parent especially if those feelings are positive rather than negative." In re Megan M., 24 Conn. App. 338,341 (1991). Kachainy appears to be comfortable and happy when she visits with her mother and siblings on a weekly basis. There is insufficient evidence for the court to find that no positive emotional aspects of the parent/child relationship survive and therefore the petitioner has failed to prove this ground.
With regard to Freddie C., the court finds that petitioner has proven by clear and convincing evidence that there is no ongoing parent/child relationship and that it would be detrimental to the best interest of the child to allow further time for the development of such a relationship. Kachainy is now ten years old. This father has had no involvement with or shown any interest in his child since she was born except for the period of time that he was incarcerated. The court finds by clear and convincing evidence that no relationship exists between Freddie and Kachainy and therefore there is no ongoing parent/child relationship within the meaning of the statute. CT Page 8718
MANDATORY FINDINGS
With respect to Nilda C. and Freddie C., as required by Conn. Gen.Stat. § 17a-112(d), the court makes the following findings:
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Nilda was offered appropriate services to help her learn to care for her child including, but not limited to, intensive in-home services and support from the medical staff at Yale. She was also allowed to have regular visits in her home with Kachainy.
Freddie did not maintain contact with DCF and therefore DCF could not offer him services to help with reunification.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance Child Welfare Act of 1980.
The court finds that DCF made reasonable efforts to reunite the family. Nilda was provided with multiple services and regular visitation. Freddie failed to maintain contact with DCF.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Nilda kept her whereabouts known to DCF, received some therapy, and complied with the AIDS Project program. She has not visited her child regularly or learned how to care for her medical needs.
4. The feelings and emotional ties of the child with respect to his parents, any guardian and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Kachainy loves her foster mother and views her as her psychological parent. She is comfortable with and enjoys a visiting relationship with her mother. She has no relationship with her father.
5. The age of the child.
Kachainy is ten years old.
6. The efforts the parent has made to adjust his circumstances or CT Page 8719 conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, and not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and, (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Nilda has made efforts to adjust her circumstances by attending counseling, visiting with Kachainy and attending some of her medical appointments. Unfortunately, these effort are insufficient to make it possible to return Kachainy home without threatening her life.
Freddie has made no effort to change his circumstances to make it in Kachainy's best interest to reunify the child with her father.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person, or by economic circumstances of the parent.
Nilda and Freddie have not been prevented from maintaining a relationship with their child by the unreasonable act of anyone.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat.
§ 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Connecticut Practice Book 33-5.
"It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman v. Lycoming County Children's Services, supra,458 U.S. 502, 513 (1982).
Kachainy has been in the same foster home for over eight years. She has not spent the night in her biological mother's home since she was eighteen months old. She is closely bonded with her foster mother, who has literally kept her alive for all of these years. She views her foster mother as her psychological parent and Dr. Grenier found that it is in Kachainy's best interest for her to remain with her foster mother CT Page 8720 permanently.
The medical providers for Kachainy do not believe that Nilda can care for this child and have warned that if she fails to provide adequate care, Kachainy will quite likely die. Kachainy deserves no less than to have the security of knowing that her foster mother will be with her as she continues to proceed with her difficult battle against her devastating illness. The court therefore finds by clear and convincing evidence that it is in the best interest of Kachainy that Nilda C.'s parental rights be terminated. It is so ordered.
Freddie C. has had very little contact with his daughter and has never provided for any of her needs. The court finds by clear and convincing evidence that it is in Kachainy's best interest to terminate his rights. Accordingly, a termination of the parental rights of Freddie C. is also ordered.
It is further ordered that the Commissioner of DCF be appointed statutory parent for Kachainy for the purpose of securing an adoptive home. The Commissioner shall file with this court, no later than sixty days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Finally, this is not a case where the mother should be precluded from having contact with her daughter in the time that both of them have remaining in their lives. They enjoy a comfortable visiting relationship and Kachainy enjoys visiting with her siblings who live with Nilda. The court therefore strongly recommends that DCF allow visitation to continue during the time period it remains the statutory parent of this child and that it encourage the adoptive mother to allow visitation in the future. Visitation should continue so that Kachainy's mother, in whatever small way, can continue to offer Kachainy love, comfort and support.
CHASE T. ROGERS, JUDGE OF THE SUPERIOR COURT